Filed 6/5/25  In re B.F. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| In re B.F., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. B.F., Defendant and Appellant. | E084699 (Super.Ct.No. INJ1900372) OPINION |

APPEAL from the Superior Court of Riverside County.  Emily A. Benjamini, Judge.  Affirmed.

Laura Vavakin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel, Tami Falkenstein Hennick and James Spradley, Deputy Attorneys General, for Plaintiff and Respondent.

1

On September 24, 2024, the juvenile court granted plaintiff and respondent's, the People, Welfare and Institutions Code section 707 motion to transfer defendant and appellant, B.F. (minor born July 2004), from the jurisdiction of the juvenile court to that of the criminal court. Minor contends insufficient evidence supports the juvenile court's order. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

On March 24, 2022, responding officers found the victim lying outside an apartment suffering from multiple gunshot wounds. Paramedics pronounced him dead at the scene. The forensic pathologist determined the victim died from multiple gunshot wounds.

The reporting party said he heard approximately five gunshots. He saw the victim standing on the sidewalk and the shooter pointing a handgun at him. The shooter returned to a waiting vehicle, in which he rode off. The reporting party captured the shooting on his home's surveillance camera.

A review of the surveillance footage from two cameras reflected a vehicle stopped in front of the apartment. The victim, who was walking down the sidewalk, approached

---

[1] It is assumed for purposes of a transfer hearing that minor committed the charged offenses. (*People v. Superior Court* (*Rodrigo O.*) (1994) 22 Cal.App.4th 1297, 1303 ["[T]he criteria the court must use to determine fitness are based upon the premise that the minor did in fact commit the offense."]; accord, *People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 682; accord, *Rene C. v. Superior Court* (2006) 138 Cal.App.4th 1, 10 ["[T]he factors used to assess fitness presuppose that the minor committed the offense."]; accord, *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 189.)

2

the open, passenger side window of the vehicle. An occupant of the vehicle asked the victim if he was from JT[2] The victim answered, "'Yeah, why."

The male passenger responded by shooting one round at the victim through the car window. The shooter then exited the vehicle as the victim ran away. The shooter fired an additional three rounds at the victim. The shooter struck the victim multiple times. The shooter then reentered the vehicle, in which he fled.

Officers identified the vehicle using a license plate reader. They located the vehicle a short time later. The officers identified the driver, the only person in the vehicle at the time. He was a BDH member. Surveillance records from nearby businesses identified from the driver's cell phone location records throughout the day reflected the presence of he and minor; minor was wearing the same clothing as the shooter in the video recordings.

Officers determined minor was with the driver "prior to, during, and immediately following the homicide based on call detail records from both [their] phones, and surveillance video footage from several businesses and residences." Minor was on probation at the time of the shooting.

---

[2] J.T. "is known to represent the 'Jackson Terrace' [(JT)] criminal street gang and . . . the victim was a documented member of [JT]. Also of note, the 'Barrio Dream Homes' [(BDH)] criminal street gang is a known rival of [JT]."

On January 5, 2020, the juvenile court had sustained allegations that minor had committed two robberies (Pen. Code, § 211)[3] while personally using a firearm (§ 12022.53, subd. (b)).

During one of the robberies, minor walked out of a clothing store without paying; he then threatened staff with a gun when they confronted him. The employee continued to watch minor; when minor noticed this, he reached for his waistband and stated, "I told you to go back inside bitch, or I'm going to shoot you."

During the other robbery, a loss prevention officer followed minor and another suspect as they left a store and began to load stolen merchandise into a vehicle. As the loss prevention officer attempted to take a picture of the vehicle's license plate, minor ran toward her, lifted his shirt, and showed her the handle of a firearm he had tucked in his jeans; minor then stated, "Back up mother fucker or I'll shoot you."

On another occasion, minor and an additional suspect entered a store, took beer, and when the store clerk asked if they intended to pay for the alcohol, minor shouted, "Fuck that I'm leaving bitch, Dream Homes!" Minor had an active warrant at the time of the incident and was later arrested. On June 14, 2021, the court sustained an allegation that minor had committed petty theft. (§ 488.) The court committed minor to a Youth Treatment and Education Center (YTEC).

During minor's total of four years on probation, the juvenile court had found minor in violation of his probation on three prior occasions. The court had issued four warrants

---

[3] All further statutory references are to the Penal Code.

for minor. Minor had received probation services that included two opportunities in the Wraparound Program and placements with a resource family, in a facility, and in YTEC.

On May 19, 2022, the People filed a subsequent juvenile delinquency petition alleging minor committed murder. The People further alleged that in committing the murder, minor personally and intentionally discharged a firearm causing death (§§ 12022.53, subd. (d) & 1192.7, subd. (c)(8)), intentionally discharged a firearm from a motor vehicle with the intent to cause death (§ 190.2, subd. (a)(21)), and that minor committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). On the same date, the People filed a motion to transfer the matter to a court of criminal jurisdiction.

The court appointed three psychologists, who each filed separate reports regarding minor's suitability and amenability to treatment under the juvenile court's jurisdiction.[4]

Minor reported that his father had been in prison since minor was eight years old, after minor witnessed his father stab someone. Minor witnessed the murder of two brothers-in-law, when he was respectively, five and six years old. Dr. Adrianne Nelson opined, "it was evident that [minor] had several adverse childhood experiences and minor to major traumas that have influenced the trajectory of his childhood and adolescence."

Minor informed Dr. Nelson that when he was four years old, his mother's ex-boyfriend punched minor in the stomach and threatened him not to tell his mother. He reported that the ex-boyfriend physically abused minor's "mother in front of him. He

_____

[4] Dr. William Jones also filed an addendum report.

described how disturbed he would get listening to his mother's screams. Minor reported he was scared to go to school for fear that while he was gone the boyfriend would physically abuse his mother." He related being bullied in school.

Minor reported varying degrees of drug and alcohol use and abuse, including binge drinking and the use of methamphetamine, marijuana, and cocaine. On March 17, 2022, while on probation, minor tested positive for cocaine.

Minor admitted being a member of BDH since he was 14 years old.[5] He had "DH" tattooed on his forearms and had two gang related tattoos on his face. Minor had remained in the gang at the time of the reports, although he reported attempting to end that involvement.

Dr. Jones opined that minor "showed some criminal sophistication regarding apparently utilizing a weapon. However, he is very criminally unsophisticated in terms of not being aware of security cameras and not giving much thought—if any—to possible negative consequences for his alleged criminal behavior. His impulsivity is certainly not criminally sophisticated." Dr. Jones further noted that, "Past interventions by the Probation Department over two years have not been very successful, although the interventions were well considered. . . . He has a fair prognosis that he could be rehabilitated during the Juvenile Court jurisdiction since this involves a long period of time with mental health treatment."

---

[5] Minor denied gang involvement to Dr. Jones.

6

Dr. Nelson opined that minor "does not come across as the most criminally sophisticated youth." "Presently, [minor] has a fair prognosis for being rehabilitated under the juvenile court jurisdiction. [Minor] would be more successful with rehabilitation in the juvenile justice system if he was able to move away and not return to the 'valley area' for several years. This would allow him time to disconnect completely from his gang. He would need to be placed in a highly structured program . . . ."

A probation officer filed a transfer report noting that minor "participated in the Wraparound Program with his mother from January 24, 2020, through June 3, 2020, when the family was closed out due to lack of participation." "[T]he family regularly no showed to both family and individual meetings with their Wraparound team. The minor also failed to meet with his assigned probation officer as directed on more than one occasion during this period. Per [minor's] reports, he was provided individual therapy and substance abuse counseling through the Wraparound program."

Minor "participated once again in the Wraparound program while residing with his adult sister as a Resource Family Applicant . . . from December 2, 2020, through December 29, 2020, when he was closed out after he absconded."

Minor "received substance abuse counseling while he was committed to . . . YTEC[] from June 22, 2021, through December 5, 2021." At YTEC, minor "received a myriad of services, including Aggression Replacement Therapy . . . , Moral Reconation Therapy . . . , substance abuse education, Youth Crossroads gang awareness, family therapy, individual therapy, and Victim Awareness."

7

Probation records also reflected that minor "and his mother were referred to the California Mentor Program with substance abuse counseling on December 8, 2021, following his release from YTEC; however, he ultimately refused to participate due to the employment he had at the time, which he subsequently quit."

A supervising probation officer told the reporting probation officer that minor had "adjusted well to the rules and expectations while at [Indio Juvenile Hall (IJH)]. Although he has been involved in a few altercations[,] overall [minor] has made tremendous strides with regards to controlling his impulsive negative behavior. . . . [T]he individual that [minor] has transformed into while at IJH . . . is a testament to the individual [minor] could be while in the community." "He has often been the voice of reason when his peers do not see eye-to-eye. [Minor] has been the youth staff rely on to be a peer mentor for first time detainees at IJH as well as detained youth with disabilities. [Minor] ensures they are part of the group and can participate in daily programming. [Minor] can often be seen in the unit sitting next to youth and giving them positive advice."

The reporting probation officer opined that criminal "sophistication was inherent in the elements of the offense, as it appears to have been planned, deliberate and for the benefit of a criminal street gang." Minor's "involvement in the current offenses appears to show a pattern of criminal behavior in which he continuously places himself in situations that endanger himself and the community. At the time of [the] offense, [minor] was on probation and was aware he had conditions that precluded him from associating with known probationers or criminal street gang members and prohibited him from being in possession of weapons of any kind and from associating with persons in possession of

8

weapons. Further, two of the minor's three previously adjudicated matters were for violent and serious offenses involving firearms, further showing [minor] was aware that possessing a firearm could lead to him being arrested."

Minor had "largely received the entirety of services the juvenile justice system has to offer, and all have proven to be unsuccessful as he has continued to re-offend in increasingly violent ways, culminating in the murder of another human being." Minor's "demonstrative history, failure to cooperate or connect with community resources prior and post release from YTEC, gang membership and gang entrenchment as well as continuing to carry and use firearms post release from YTEC, are not indicators of an individual to whom juvenile services would be appropriate."

"Records show the only time [minor] has fully and successfully completed any rehabilitative service has been while placed in a secure facility and even then, once he completed the program and returned to the community, he failed to apply what he learned to his day-to-day life in a sustained law-abiding manner. Further, since [minor] has been in custody pending the instant matters, he has continued to engage in violent behaviors as the aggressor in eight separate physical altercations." The reporting probation officer opined that minor should be transferred to a court of criminal jurisdiction.

On July 8-11, 15-16, 18, 23, and 31, 2024, the juvenile court held the transfer hearing. Cathedral City Police officers testified that JT was a documented criminal street gang in the City of Indio; BDH was a documented criminal street gang in Cathedral City; the two gangs are rivals.

9

The People played a video recording of the shooting. An occupant of the vehicle could be heard on the video saying, "Are you JT." The victim responded, "Yeah, why?" Officers identified minor from surveillance footage from the apartment, several businesses, and cell phone records.

Minor was an active member of BDH with the gang moniker of "Lil Grande." Minor had BDH gang tattoos.[6] One of the officers testified that the shooting would benefit both BDH and minor as a member of BDH.

The probation officer who authored the transfer report testified that minor's prior history on probation was unsuccessful because "he accrued multiple violations of probation, multiple warrants were issued on his behalf, and he received new petitions." Minor demonstrated "a high level of criminal sophistication." This was based on the homicide itself, minor's "actions after the homicide [and] the lengths he went to . . . avoid discovery. That during the offense [minor] conceal[ed] the firearm until the victim was within a very close range, [and] contin[ued] to discharge the firearm after the victim began to run away."

"[M]ore than one shot indicates deliberation in one's actions and a certain intent." "I believe . . . that it was like luring the victim over before ambushing him, . . . ." The fact that a random person, rather than a specific person, was the object of the shooting

---

[6] The People's supplemental exhibit, reflected that despite the psychologists' encouragement, minor's eventual request, and the offer to provide such services, minor ultimately displayed "resistance" and then disinterest "in tattoo removal services."

displayed an intent to harm anyone. The probation officer also noted that since minor's incarceration in IJH, he had been involved in eight fights in which he was the aggressor.

The probation officer noted that minor "had done the WRAP Around program on two separate occasions, that included substance abuse and individual therapy. He received a myriad of services at YTEC . . . ." "Upon his completion of YTEC he was referred to the California Mentoring Program with substance abuse." Minor "has not demonstrated a wanting or willingness to complete any rehabilitative service outside of a secure setting."

"[W]hile [minor] completed the YTEC program, upon his return to the community he did not put into practice any of the skills that he learned; he engaged in further criminal activity." "[T]here's nothing in his history to indicate that that would be successful in his rehabilitation." "[H]is demonstrative history and his negative behavior since he's been in custody indicate that [rehabilitation is] not possible." "[H]e's not amenable to juvenile services."

Rehabilitation is "whether someone makes sustained positive changes, takes advantage of services, and implements what they learned to be successful in their life." "[A]ll the services that have been offered to [minor] in the community, he has never completed any. And while he did complete the YTEC program, upon his release he began using illegal substances and he was arrested for the current matter."

The reporting probation officer noted that despite all the services minor had received, he escalated his criminal activity by committing a "violent offense for the benefit of a criminal street gang . . . ." Thus, he opined that minor was suitable for

11

transfer to the criminal court. This was "based on the total involvement that [minor] had in the offense, that he had previously been arrested for firearm related offenses, and witnessed firearm violence in his life and still chose to engage in the homicide." The probation officer found additional support for his conclusion in the fact that minor was nearly 18 years old when he committed the homicide and had only been released from YTEC three months earlier.

Dr . Nelson testified that minor "expressed traumas . . . and—adverse childhood experiences that occurred both inside of the home, as well as outside of the home." "He also reported that when he was a child[,] he witnessed his brother-in-law get stabbed. [¶] He witnessed another—his sister's boyfriend, I believe, get shot. [¶] He also said that he witnessed his father stab someone, which led to his father being imprisoned . . . ." Minor reported both his mother and he were victims of domestic violence by one of his mother's boyfriends. "[T]hese adverse childhood experiences opened the door to him starting to engage in some delinquent behaviors."

Dr. Nelson opined that minor was not criminally sophisticated. His behaviors "involved him engaging in highly risky and reckless behaviors that indicated to me he really didn't plan or think things through when engaging in the behavior." Minor's prognosis was "fair to relatively good" if he could be removed from the gang and desisted in using intoxicants. Dr. Nelson opined that minor would likely make significant progress if given five years of programs under the juvenile court's jurisdiction "if he was really engaged."

12

A criminal mitigation expert who had spent over three hundred hours with minor in IJH opined that minor would be successful in rehabilitation: "He's taken what we've taught him and he's applied it, not only in his own life, but in the lives of other youth."

The supervising probation officer in IJH for the previous 26 months during which minor had been in the unit testified that the minor she "met when he first arrived at [IJH] was a very different [minor] than the [current minor] . . . as far as his ability to make . . . better decisions when it comes to controlling his temper or when he's upset, how he handles himself. Being able to vocalize his frustrations or asking for staff to put him in his room, what we call self-placed confinement, so that he can have time alone." Minor "has demonstrated the ability to be a mature young man, which is . . . what we're used to seeing in the community . . . where . . . young men are respectful, mature, and have the ability to communicate with words rather than . . . being aggressive."

The unit had been fight-free for 173 days, which the officer attributed, in part, to minor's leadership. Minor had "been a peer mentor to some of the younger youth. And he's been a peer mentor to one . . . specific youth that stands out . . . who had learning disabilities. So [minor] took it upon himself to be able to coach him and help him when it was time for physical agility stuff. The kid was unable to do any of it, but yet [minor] was the one that, without anyone asking him, he just took it upon himself to be his . . . mentor."

After the hearing, the court issued a written ruling finding that three of the five requisite criteria supported transfer to the criminal court. The court found that minor was criminally sophisticated, that previous attempts to rehabilitate minor had been

13

unsuccessful, and that the gravity of the instant offense "showed an extreme indifference to human life." Therefore, the court concluded minor was not amenable to treatment within the juvenile court's jurisdiction and transferred the matter to the criminal court.

## II. DISCUSSION

Minor contends insufficient evidence supported the court's finding by clear and convincing evidence that minor should be transferred to a criminal court, that insufficient evidence supports the court's finding that defendant is unamenable to treatment during the next five years, that the court relied on factors not supported by substantial evidence, that the court ignored expert opinion proving minor is amenable to treatment, and that the court's ruling violates minor's due process rights.[7] Defendant asserts that the court erred in failing to make the requisite "separate and specific finding of unamenability to rehabilitation." We disagree.

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court. It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' [Citation.] The prosecution bears the burden of proving that the minor should be transferred. [Citation.]" (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164.)

---

[7] Minor additionally maintains we should independently review the juvenile court's handling of the People's "discovery disclosure issues" contained in the sealed transcripts of in camera proceedings. The People agree. We have conducted an independent review of the sealed proceedings and find that no documents were incorrectly withheld from minor.

"'[T]he juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court. . . . If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.]" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164, italics omitted.)

The court must consider five statutory criteria: "(1) 'the degree of criminal sophistication exhibited by the minor' [citation],[8] (2) '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' [citation],[9]

---

**8** "With respect to the degree of criminal sophistication, . . . . mandatory factors for the court to consider[ include:] whether the minor has had any involvement in the child welfare or foster care system and whether the minor has been 'a victim of human trafficking, sexual abuse, or sexual battery.' [Citation.]" (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164-165; accord, § 707, subd. (a)(3)(A)(i) ["the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication."].)

**9** "[T]he second criterion—'[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' [citation]—is distinct from the ultimate determination 'that the minor is not amenable to rehabilitation while under the

*[footnote continued on next page]*

15

(3) '[t]he minor's previous delinquent history' [citation], (4) '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor' [citation], and (5) '[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor' [citation]." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164; accord, *In re J.S.* (2024) 105 Cal.App.5th 205, 212.) "[T]he statute does not require that any of those criteria be afforded any greater weight than any other. [Citation.]" (*Miguel R.*, at p. 167.)

"The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence. [Citation.] In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings. [Citation.]" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

"Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.] Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard. [Citation.]" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

A. Criminal Sophistication

The court recited at length the relevant evidence it had considered with respect to its determination that defendant was criminally sophisticated. It found of particular

---

jurisdiction of the juvenile court' [citation]." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 167.)

relevance that minor was on juvenile wardship probation when he committed the instant offense, that he had just met with his probation officer seven days before the shooting, that he had just completed the YTEC program three months earlier, and that he knew he was not permitted to be in possession of a firearm. The court noted that minor had been on wardship probation since he was 15 years old and had been receiving a variety of intensive services over the years.

It found that the shooting was "clearly gang related." The court found minor's behavior of "repeatedly discharge[ing] a firearm, and the seeking out of a gang-rival, . . . and not just shooting him one time, but shooting him at close range and then shooting him three more times in rapid succession after he had clearly been wounded, signals a higher degree of criminal sophistication to the court." The court noted that minor was only three months shy of being 18 years of age when he committed the offense.

The court concluded, "After considering all of the above, (despite the Minor's traumatic history), the whole picture, the court feels significant facts include, Minor's age being very close to the age of majority, the egregious facts of the offense, Minor's previous history with firearms, the fact that Minor was armed with a firearm, when he was prohibited from possessing a firearm because he was on wardship probation for a firearm offense with enhanced supervision, and that he shot [the] victim . . . multiple times at close range after he had already been wounded once, the offense was clearly gang-related and showed an extreme callousness and indifference to human life, and considering . . . Minor's evasive behaviors after the incident to actively evade law enforcement and 'brag' about it on social media, and still make statements on social media in support of his gang

all demonstrate to the court that he possessed criminal sophistication." The court's exposition itself demonstrates substantial evidence supporting its ruling.

The evidence adduced at the hearing unequivocally supported the following facts cited by the court to support its determination that minor was criminally sophisticated: minor was on probation when he committed the instant offense; he had met with his probation officer seven days before the shooting; he had just graduated from YTEC approximately three months before the homicide; minor had been informed that he was forbidden from possessing a firearm as a term of his probation; he had been on probation since he was 15 years old; and minor had received a plethora of services since the juvenile court first placed him on probation. The juvenile court had previously found true allegations that minor had committed crimes while personally armed with a gun.

The evidence supported the court's conclusion that the shooting was "clearly gang related." The People not only adduced police reports and officer testimony regarding the shooting, but they also produced a video with sound recording of the actual shooting. The video, along with other evidence, reflected that one of the vehicle's occupants asked a random person, "Are you JT." The victim responded, "Yeah, why?"

Minor was an active member of BDH with gang tattoos and the gang moniker of "Lil Grande." JT was a known rival of BDH. One of the officers testified that the shooting would benefit both BDH and minor as a member.

Minor shot one round at the victim from inside the car. He then exited the vehicle as the victim ran away and fired an additional three rounds at the victim. The victim was struck multiple times and killed. Minor then reentered the vehicle in which he fled.

18

Minor thereafter posted on social media that he knew officers were looking for him and "joked about keeping away from the police." Thus, the facts supported the court's determination that the shooting was gang related, "egregious," and "showed an extreme callousness and indifference to human life." Likewise, minor's behavior is substantial evidence supporting the court's finding that defendant was criminally sophisticated.

Minor's counsel argues that minor's "childhood trauma and substance abuse should have been given greater weight as mitigating factors." Minor's counsel complains that minor's "intellectual disabilities and experiences of bullying in school exacerbated his difficulties." Minor makes many similar arguments about various aspects of the record that he contends the court incorrectly interpreted or to which the court accorded inaccurate weight.[10]

However, "it is the exclusive province of the trial judge . . . to determine the credibility of witnesses and the weight to be afforded any evidence [citations]." (*People v. Tice* (2023) 89 Cal.App.5th 246, 256.) "Under a substantial evidence review, however, we do not reweigh the evidence. [Citation.]" (*People v. Werntz* (2023) 90 Cal.App.5th 1093, 1117, fn. 9.) We will not reweigh or reevaluate the juvenile court's determinations on these matters so long as substantial evidence supports the court's findings.

---

[10] For instance, minor complains that his involvement and association with BDH "does not necessarily indicate criminal sophistication"; that "the court's emphasis on [minor's] actions during the offense . . . does not conclusively establish criminal sophistication"; and "the court's consideration of [minor's] ability to avoid detection and arrest for several months, along with his social media posts about avoiding law enforcement, does not prove criminal sophistication."

Moreover, the court recited the evidence of minor's childhood trauma and drug use. The court expressly acknowledged minor's trauma in its ruling: "There is no downplaying the violence that Minor witnessed as a child: stabbings and homicides and it is documented that his family was placed into protective custody due to their involvement in this community violence." "[I]t is undeniable that Minor has suffered trauma in his early childhood, . . ."

Thus, the court expressly considered minor's trauma. The court simply found that minor's criminal behavior outweighed any mitigating value it should accord his past trauma. The court's determination that minor was criminally sophisticated was supported by substantial evidence.

B. Success of Previous Attempts at Rehabilitation[11]

The court found that minor had "been afforded a multitude of rehabilitative services . . . during his lengthy involvement in the juvenile system." "However, despite the abundance of supportive services during . . . Minor's time of probation, upon release from YTEC, Minor re-offended within three months . . . and did not demonstrate that he was putting into practice any of the skills he had obtained as there was a significant escalation in violence, firearm use, negative peer/gang association and substance usage." The court concluded this factor supported minor's transfer to criminal court.

---

[11] We do not address the two factors that the court found did not support transfer to the criminal court since minor does not challenge them.

20

Substantial evidence supported the court's finding. Minor had received probation services, which included two opportunities in the Wraparound Program and placements with a resource family, in a facility, and in YTEC.

Minor "participated in the Wraparound Program with his mother from January 24, 2020, through June 3, 2020, when the family was closed out due to lack of participation." "[T]he family regularly no showed to both family and individual meetings with their Wraparound team. The minor also failed to meet with his assigned probation officer as directed on more than one occasion during this period. Per [minor's] reports, he was provided individual therapy and substance abuse counseling through the Wraparound program."

Minor "participated once again in the Wraparound program . . . from December 2, 2020, through December 29, 2020, when he was closed out after he absconded."

Minor "received substance abuse counseling while he was committed to . . . YTEC[] from June 22, 2021, through December 5, 2021." At YTEC, minor "received a myriad of services, including Aggression Replacement Therapy (ART), Moral Reconation Therapy (MRT), substance abuse education, Youth Crossroads gang awareness, family therapy, individual therapy, and Victim Awareness (VA)."

Minor "and his mother were referred to the California Mentor Program with substance abuse counseling on December 8, 2021, following his release from YTEC; however, he ultimately refused to participate due to the employment he had at the time, which he subsequently quit." Dr. Jones noted these "interventions were well considered . . . ." As the reporting probation officer concluded, minor had "largely received the

entirety of services the juvenile justice system has to offer, and all have proven to be unsuccessful as he has continued to re-offend in increasingly violent ways, culminating in the murder of another human being."

After all the services provided to minor, three months after being released from YTEC, while still on probation, minor obtained a firearm and killed a random person without any apparent provocation or reason other than to boost his and his gang's reputation. Minor was so intoxicated when he was arrested, that officers took him to the hospital. Substantial evidence supports the court's finding that previous attempts at rehabilitation had been unsuccessful, and that this criterion supported minor's transfer to the criminal court.

### C. Circumstances and Gravity of the Offense

The court noted that when minor committed the instant offense, he "was already on probation for serious offenses (robberies with gun enhancements) and not allowed to possess a firearm. Minor . . . fled the scene, leaving the victim gravely injured and to die shortly thereafter."

The court found that minor "continued to shoot the victim multiple times after [the] victim . . . was already shot one time (and attempting to flee from Minor) and already crying out in pain." "The killing of [the] victim . . . was callous and showed an extreme indifference to human life when Minor continued to fire multiple shots after he had already wounded him." The court found this factor supported transfer to the criminal court.

The court's finding was supported by substantial evidence. Minor had previously obtained a handgun in violation of the terms of his probation. Minor approached a random individual. Minor then shot one round at the victim through the vehicle's window. He then exited the vehicle as the victim ran away and fired an additional three rounds at the victim. The victim was struck multiple times and killed. Minor then reentered the vehicle, in which he fled. Minor thereafter posted on social media that he knew officers were looking for him and "joked about keeping away from the police."

As the reporting probation officer noted, minor effectively participated in luring an unsuspecting, random individual into an ambush, which resulted in his death, for no apparent reason other than to bolster minor's and minor's gang's reputation. Substantial evidence supported the court's determination that the gravity of the offense weighed against minor because it was "callous and showed an extreme indifference to human life." Thus, the court's finding that this criterion supported transfer to the criminal court was supported by sufficient evidence.

Moreover, the court noted that it had considered minor's "significant early childhood traumas and does not diminish the substantial suffering he endured (witnessing countless acts of violence including his father stab multiple persons [*sic*] and witnessing at least two others killed) when he was a very young child . . . on balance, the court does not find that it mitigates the gravity of the offense." "The court has weighed the mandatory factors and considered Minor's mental and emotional development because of his (early childhood) and traumatic upbringing, however, the court finds Minor clearly understood the wrongfulness of his actions . . . ." "The court does not find sufficient facts or evidence

23

that could mitigate the gravity of the offense."  Thus, again, the court properly considered the mitigating factors but determined that the gravity of minor's offense outweighed any influence the court should give the mitigating factors.

D.  Totality of Evidence

Prior to the hearing, the court indicated it had read the petition, the motion to transfer, the probation officer's report, the psychologists' reports, and the parties' briefs. In its written ruling on the transfer motion, the court accurately recited the applicable law. The court noted that it considered all the documentary evidence, the exhibits, the witnesses' testimony, and counsels' arguments presented during the hearing.  The court issued a written finding on each of the five requisite criteria in ruling on a motion to transfer.  The court expounded on the law and facts adduced at the hearing on each of those criteria.

When making its final determination, the court noted, "The focus now is on Minor's amenability to rehabilitation.  The court's decision is based on an evaluation of all the criteria and factors and based on all evidence presented.  In this matter, the evidence has shown that Minor is not amenable to treatment and rehabilitation while under the juvenile court jurisdiction . . . .  The court is making this finding by clear and convincing evidence.  The court agrees with the Probation Officer's ultimate recommendation that the Minor is not appropriate to remain under the jurisdiction of the juvenile court."

"The court has considered the mandatory factors in each of the five transfer criteria. The court has applied the burden of proof of clear and convincing evidence, and the court

has considered whether the Minor is amenable to the treatment and services and likely to be rehabilitated. Although the court found that Petitioner has not sustained its burden on Factor Two and Factor Three, based upon all the evidence presented, the court ultimately finds that Minor is not amenable to treatment and the services through the juvenile court."

"After considering all the evidence admitted during the lengthy hearing, the court concludes that Minor is not amenable to treatment within the juvenile court's jurisdiction, considering the significant weight the court is giving to the factors where the court has concluded that transfer is appropriate." Minor's "demonstrated entrenchment in his gang, even upon completion of a secured youth treatment program (three months before the homicide) and four years of intensive juvenile court services could not deter his underlying conduct and affect the court's consideration of his ultimate amenability to services within the jurisdiction of the juvenile court." Minor "was guarded about his role and his future with the gang; there was an ambivalence to disconnect[ing] with the gang . . . ."

Minor refused "to follow through with tattoo removal services upon his release from YTEC and then his immediate return to his negative peers (including high ranking BDH gang members) while being on the most intensive probation supervision (enhanced aftercare), when he was close to the age of majority—three months shy of 18, leads the court to the inevitable conclusion that he [is] not amenable to services under juvenile court jurisdiction since the concept of rehabilitation encompasses conduct in the community as well as that in a secured setting. The probation department and the juvenile court have afforded the Minor a multitude of intensive services to address treatment in the

25

community and in a secured setting for a period of four years. Despite the resources and while being intensely supervised, the Minor committed the most serious and violent offense, a homicide, that resulted in the loss of life of an unarmed person walking down a residential street. The court has gone beyond the circumstances surrounding the offense itself and is considering the rehabilitative services the Minor has already been afforded, the highest level of supervision, the fact that he has not taken advantage of previous offers of tattoo removal, the ambivalence to disengage from his gang in the future, the circumstances and gravity of the current offense are a factor, his continued access to and use of firearms, all lead the court to the conclusion that he is unamenable to treatment within the juvenile court's jurisdiction."

Thus, the court demonstrably made a "separate and specific finding of unamenability to rehabilitation." Further, as the court noted, minor did display "resistance" and then disinterest in tattoo removal services. As discussed *ante*, all the remaining factors considered by the court in ultimately concluding that defendant was unamenable to rehabilitation under the juvenile court's jurisdiction were supported by substantial evidence. The court's order transferring minor was, therefore, likewise, supported by substantial evidence.

26

Again, the court recognized that it was "undeniable that Minor has suffered trauma in his early childhood . . . ." The court also noted that minor's "conduct tends to be good in a secured setting . . . [and] he has shown significant improvement over the last year by all accounts . . . ." Nonetheless, the court exercised its discretion in determining that the aggravating factors outweighed the mitigating factors. The court's determinations were supported by substantial evidence.

### III.  DISPOSITION

We affirm the juvenile court's order granting the People's motion to transfer the matter to a court of criminal jurisdiction.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

FIELDS
J.

RAPHAEL
J.

27